HOLMES BURGLAR ALARM TEL. CO. *et al.* v. DOMESTIC TELEGRAPH & TELEPHONE CO. *et al.*

(*Circuit Court, D. New Jersey.* April 12, 1890.)

1. PATENTS FOR INVENTIONS—LICENSE—ASSIGNMENT.
    Though a license granted by the owner of a patent was not transferable, the existence of a license to the assignee may be shown by proof that the owner recognized and dealt with him as a licensee.

2. SAME—VERIFICATION.
    The absence of evidence that a certain claim of letters patent was covered by the oath of the inventor will not invalidate the claim.

3. SAME—REISSUE.
    A patentee can claim on a reissue whatever clearly appears to have been a part of his original invention as described or shown in his original specifications, drawings, or models.

4. SAME.
    A reissue is not invalid though no interference was had between the application therefor and a patent, no date of which is prior to the invention, claimed in the reissue, and described in the original patent.

5. SAME—VARIANCE FROM ORIGINAL CLAIM.
    Reissued letters patent No. 4,297, granted to William B. Guernsey, March 14, 1871, for improvement in electro-magnetic burglar alarms, are not invalid for variance from the original patent on the ground that the latter does not cover a single circuit form of apparatus, since the drawings in such patent showing a single wire; if by mistake or accident, the use of the wire was not sufficiently described in the original specification, a reissue to supply the omission was properly granted.

6. SAME—INFRINGEMENT.
    Said letters patent, combining in the same organization of circuits the characteristic signal instruments of both the open circuit and closed circuit systems, with a resistance or resistances in such a manner as to make each instrument guard against disabling the apparatus from causes such as would disable the other, are infringed by an apparatus of substantially the same construction and accomplishing the same results, the latter using, in place of an electro-magnet and armature, a galvanometer, to open and close a local circuit, and a "relay" corresponding to a closed circuit instrument; and it is immaterial that the galvanometer is made to perform an additional function.

7. SAME—COMBINATION.
    Such patent contains a patentable combination though its parts are old, and act successively and not simultaneously.

8. SAME—ANTICIPATION.
    Such letters patent were not anticipated by the English patent to Tyer, in 1865, for an apparatus for transmitting signals indicating the position of a train on a railway, nor by that to Varley in 1865, which was for a modification of the ordinary closed circuit system, nor by that to Mixon in 1866, which would require substantial alterations to make it accomplish the results of the Guernsey patent.

**9. SAME—FOREIGN PATENT.**
    The existence of an English patent for which letters were subsequently granted by the United States dates from the time when the great seal was attached.

In Equity.

Suit to restrain infringement of letters patent, brought by the Holmes Burglar Alarm Telegraph Company and the Municipal District Telegraph Company against the Domestic Telegraph & Telephone Company, George W. Hubbell, Enos Runyon, F. T. Fearey, and Jabez Fearey.

*S. A. Duncan* and *L. E. Curtis*, for complainants.

*G. G. Frelinghuysen*, for defendants.

WALES, J.   This suit was brought to restrain the defendants from infringement of reissued letters patent No. 4,297, for improvements in electro-magnetic burglar alarms, granted March 14, 1871, to William B. Guernsey.   One of the complainants is the owner of the patent, and the other is alleged to be a licensee under it.

The bill sets out the title of the Holmes Burglar Alarm Telegraph Company, and the granting of an exclusive license, for certain purposes, to the Municipal District Telegraph Company; but objection is made in the answer of the defendants that in fact no license was ever granted to the Municipal District Company, and, in consequence of the absence of joint interest and privity between the parties complainant, the bill should be dismissed on account of this misjoinder.   Waiving a consideration of the question whether this objection should not have been taken by a plea in abatement, it is sufficient for the present purpose to say that the testimony of the witness, Holmes, and the written agreements in relation to the ownership and use of this patent, which are set out in the complainants' exhibits, afford satisfactory proof that a license was given to the Municipal District Company, as is alleged in the bill.   The granting of a license may be proved by the acts and dealings of the parties who own, and permit others to use, the patent, without the necessity of resorting to written instruments; and it clearly appears from the proofs that prior and up to the time of bringing this suit the Municipal District Company had been treated and acknowledged as its licensee by the owner of the patent.   This inference of fact is drawn from the transactions which were had between the Holmes Burglar Alarm Company and its immediate licensee, the Protective Company, which latter company transferred its license to the Municipal District Company.   Admitting, as is claimed by the defendants' counsel, that the license to the Protective Company was personal only, and not transferable, and that it had not, prior to its assignment to the Municipal District Company, any right to assign its license, yet it is certain that the Holmes Burglar Alarm Company acquiesced in and ratified the assignment, and thereafter recognized the Municipal District Company as its licensee.   There is no restrictive provision in any of the agreements which prevented the owner of the patent from conferring authority on the Protective Company to assign its license, and such authority may be proved without the aid of written articles.   This conclusion dispenses with the necessity of dis-

cussing the regularity of the mode adopted by the defendants in present-ing the objection of misjoinder, which, under the technical rule of plead-ing, and equity rule 39, should have been taken advantage of by a plea in abatement.

Another preliminary objection which is insisted on by the defendants' counsel is that claim 2 of the original Guernsey patent, which is made claim 4 of the reissue, is not covered by the oath of the inventor, and is therefore a nullity, and forms no part of the real patent. There is no evidence on this point, and there is equal ground for the presumption that the oath was taken as that it was not. But is the taking of the oath absolutely necessary? In *Whittemore* v. *Cutter*, 1 Gall. 433, Judge STORY said: "The taking of the oath was but a prerequisite to the granting of the patent, and in no degree essential to its validity." In *Crompton* v. *Belknap Mills*, 3 Fish. Pat. Cas. 536, the defendants, as in the present case, relied upon a certified copy of the file wrapper and contents to show that the oath had not been taken, but the court said:

"We are not satisfied the oath was not taken. The letters patent recite that it was. * * * But suppose the oath was not taken. Would the patent be void on that account? It was held otherwise by Judge STORY in *Whittemore* v. *Cutter, supra*. The taking of the oath, though it be done prior to the granting of the patent, is not a condition precedent, failing which the patent must fail. It is the evidence required to be furnished to the patent-office, that the applicant verily believes he is the original and first inventor of the art, etc. If he take this oath, and it turns out that he was not the first in-ventor or discoverer, his patent must fail, and is void. So, if he do not take it, and still he is the first inventor or discoverer, the patent will be supported."

It has also been held that this is not a matter to be inquired into col-laterally in an infringement suit. *Hoe* v. *Kahler*, 20 Blatchf. 430, 12 Fed. Rep. 111; *De Florez* v. *Raynolds*, 14 Blatchf. 505. And in *Railway Register Manuf'g Co.* v. *North Hudson R. Co.*, 24 Fed. Rep. 793, the court recognized the right of an applicant's attorney to insert in a pending ap-plication amended and enlarged claims, without having them verified by the oath and signature of the patentee, provided only they relate to matter substantially shown and described in the specification. As to the oath, it was decided in *Seymour* v. *Osborne*, 11 Wall. 516, that re-citals in letters patent that the required oath was taken before the same was granted are, in the absence of fraud, conclusive evidence that it was so taken.

Original letters patent No. 108,257 were issued to Guernsey, October 11, 1870, and the reissue for the same invention, No. 4,297, were granted to him on March 14, 1871. The nature and objects of the in-vention are, in part, thus specified by the patentee in the reissue:

"*The principal object of my invention is to provide an electrical appara-tus which will give an alarm or an indication either in the event of the con-ducting circuit being broken, or in the event of a new or shorter circuit being formed.* To this end I employ a continuous circuit, or a circuit capable of being made continuous at will, arranged with *a resistance* or resistances so that the current which is allowed to pass will not possess sufficient electro-motive force to effect the alarm, but having such arrangements at windows

and doors, and other places to be guarded, as will, on any tampering there-with, short-circuit the current past or around the said *resistance or* resistances to an extent sufficient to actuate the alarm.   My invention thus combines the advantages, and avoids the disadvantages, of the two varieties of electro-magnetic alarms which are distinguished as the ' closed circuit' system and the ' open circuit' system.   *I will proceed to describe a way of carrying out my invention by the use of two separate electro-magnets, each of which may constitute a resistance to prevent the sounding of an alarm until the circuit is either made around or past such resistance, or broken.   More than one magnet or resistance is not essential in carrying out the invention, as will be understood from the following explanation:* Fig. 1 shows in perspective two electro-magnets, with separate conductors connected with a common battery, each conductor passing through an alarm, and through suitable connecting devices, which may be located in the frames of windows, or at any desired points, in such a manner that the opening of a door or window, or the performance of any act which it is desired to detect, will connect one conductor with the other, and avoid both electro-magnets.   For this purpose the magnet of one conductor is located near the positive pole, and that of the other near the negative pole, of the battery.   Fig. 2 illustrates a modification, in which one magnet *may be* dispensed with, and a simple resistance coil introduced *at the point to be protected* in such a manner that the act to be detected will close a short circuit, avoiding the resistance, and thus sounding the alarm. This more simple form of the apparatus in applicable to places where a single window, door, or other object is to be protected."

Then follows a general description of the drawing:

"*Two magnets and two conducting wires are shown and described, but only one magnet or other electro-motor, and one conducting wire, is necessary to accomplish the same effect, as will be manifest by an examination of the arrangement, and a knowledge of the principles involved.   The location, with regard to each other, of the various members or elements of the alarm, is not an essential part of the invention, and can be varied as circumstances dictate.*"

" Where but a single place is to be protected, as, for example, for the vault door of a bank, the apparatus may be simplified, dispensing with one of the resistance magnets, and employing a simple resistance, R, (Fig. 2,) *placed at the point to be protected,* and so arranged *with regard to the other members of the alarm* that the opening of the door or window, or the doing of any act which the alarm is to detect, will short-circuit the conductor, by forming a connection between the wires across, or independently of, the re-sistance."

" Various other modifications will readily suggest themselves for the accomplishment of the object without departing from the essential principles of the invention; the design being to obtain an alarm in which the signals shall be given by the closing or making of connection between two different conductors, or between two parts of the same conductor, *essentially* as is done in the open or interrupted circuit alarms, while at the same time there is or may be a continuous circuit in the said conductor or conductors, which by proper contrivances may be made to give notice to the person in charge of said alarm of any injury, accidental or malicious, which may have happened to his instrument or its belongings."

The third and fourth claims of the reissued patent are precisely identical with the first and second claims of the original patent, with the exception of the italicized words, which have been inserted in the reissue, and are as follows:

"(3) The combination in an electro-magnetic alarm of a continuous circuit or circuits with a sufficient resistance or resistances, and an alarm or alarms, when the said combination·is so arranged that the severing or interrupting of the said circuits, or of either of them, shall cause the said alarm or alarms to sound, and also that the short-circuiting or diverting the course of the electrical current in said circuit or circuits around or past the said resistance or resistances shall sound an alarm, *or cause an alarm to be sounded.* This when the whole arrangement is properly combined with a sufficient battery, and with 'connections' or contrivances at points to be guarded which will, upon the doing of certain acts or the happening of certain things, short-circuit the said electrical current or currents past or around the said resistance or resistances, and so give the desired alarm.

"(4) In a burglar or fire alarm, the combination of an open and a closed circuit *to operate* substantially as set forth."

The third and fourth claims of the reissue have not been enlarged, and are identically the same with the first and second claims of the original, with the exception of the italicized words in the former, which do not materially change their effect. The drawings accompanying both patents are the same. The specifications in the reissue are the same as in the original, excepting the italicized portions, and describe the nature and objects of the invention more clearly and plainly than is done in the latter, in order to cover any element to which, by a fair construction of the original, the patentee would have been entitled; and for this purpose a reissue has always been allowed when the patentee has, by inadvertence or mistake, omitted to make such a description in the original. A patentee can claim on a reissue whatever clearly appears to have been a part of his original invention as described or shown in his original specifications, drawings, or models; and Guernsey has done no more. *Battin* v. *Taggert,* 17 How. 74; *Gallahue* v. *Butterfield,* 10 Blatchf. 232; *Wheeler* v. *Reaper Co.,* 6 Fish. Pat. Cas. 1; *Seymour* v. *Osborne,* 11 Wall. 544; *Calkins* v. *Bertraud,* 6 Biss. 494; *Russell* v. *Dodge,* 93 U. S. 460.

The two prior systems referred to by the patentee were well known at the date of the patent, and had been in extensive use; but each had certain serious and recognized·defects which it was the object of Guernsey's invention to obviate. The advantages and disadvantages of the old systems are thus stated by Prof. Brackett, a witness for the complainants:

"The advantage of the open circuit system is that the apparatus cannot be disabled by connecting the two parts of the circuit together between the battery and the point protected, since such connection would sound the alarm in the same manner as opening the door or window. The disadvantage of this system is that the circuit may be·cut or disconnected at any point without sounding the alarm, and this would completely disable the apparatus, since no alarm would be given upon a subsequent opening of the door or window. Such a system offers no difficulty to a burglar, except as the wires leading from the battery to the protected structure be effectually concealed, which might be difficult to do. The advantage of the closed circuit system is that the line is protected against cutting or interruption, since such an act would sound ʻthe alarm; and its disadvantage is that it may be completely disabled by forming a short circuit around the point protected, since this would not sound the alarm, nor would the alarm be sounded by any subsequent opening of the door or window."

It is thus apparent that each of these prior systems afforded sufficient protection as long as the wires or conductors remained intact, but both were fatally defective, in that they could readily be disabled by tampering with the wires; and it was the object of the Guernsey invention to protect the wires or conductors from being tampered with by any method applicable to either of these systems.   Mr. Pope, another witness for the complainants, thus states the general nature of the invention:

"Guernsey was the first, so far as I am able to ascertain from the evidence in this case, or otherwise, to combine in one and the same organization of circuits the characteristic signal instruments of both the open circuit system and the closed circuit system with a resistance or resistances in such a manner as to make the open circuit instrument guard against disabling the apparatus by any method applicable to the ordinary closed circuit system, and, conversely, to make the closed circuit instrument guard against disabling by any method applicable to the ordinary open circuit system."

Both complainants and defendants are engaged in the business of central office protection, and, as is alleged, make use of almost identically the same form of apparatus.   The defendants' apparatus consists of a battery, two principal instruments, and their accessories, conductors connecting the battery and instruments with an electrical casing inclosing a safe, a resistance, and contact springs connected with the door of the safe casing.   Both instruments are included in the circuit, so that the current traverses their coils successively.   One of them, designated as the "galvanometer" in the drawing, consists of a magnetized needle pivoted so as to swing freely in either direction in front of a coil through which a current passes.   Its movement is limited by contact stops which form the terminals of a local circuit containing an alarm bell, B.   The instrument is so constructed and adjusted that, when the resistance at the safe is included in the circuit, the needle stands between the two stops, but, when the current is strengthened by short-circuiting the current past or around the resistance, the needle is swung by the influence of the current in the coil against the stop at the right, and an alarm is sounded on the bell, B.   It thus performs the function of the ordinary open circuit instrument.   In addition to this, when the circuit is broken the needle swings against the stop at the left, and rings the same bell.   The other principal instrument, designated as a "relay" in the diagram, corresponds in all respects, in construction and mode of operation, to the ordinary closed circuit instrument.   By the intervention of two local circuits, it is made to release a drop or shutter and ring an alarm bell, C, when the current ceases to flow through its coils. There are two sets of contact springs at the safe, so arranged that upon the first movement of opening the door the circuit is broken at the springs, J, J,[1] at the top, and an alarm is sounded upon both the bells, B and C.   Upon opening the door a little further, a short circuit is formed around the resistance coil, R, through the wire, G, G, and the galvanometer swings to the extreme right, and again rings its bell, B. If any attempt is made to tamper with the apparatus by cutting either of the wires leading to the safe, an alarm is sounded both upon the gal-

vanometer bell, B, and the relay bell, C; and if the wires are short-circuited an alarm is sounded on the galvanometer bell, B. It is contended on behalf of the complainants that the defendants' apparatus, the operation of which is thus described, contains the gist of the Guernsey invention, since it contains instruments having the characteristic mode of operation of the instrument of the two old systems referred to in the patent, and these are combined in the same circuit with a resistance so arranged as to render both instruments operative. The result of this combination is that the wires leading to the safe are effectually protected both from interruption and from short-circuiting. In other words, the same result is produced by substantially the same means in defendants' apparatus as in the apparatus of the patent. It is conceded that the use of a galvanometer needle, such as is used in the defendants' apparatus, to open and close a local circuit, including an electric bell, was well known in the art prior to the date of the patent, and that the galvanometer was recognized as an equivalent, for that purpose, of an electro-magnet and armature, such as is shown in the patent. It is urged by the defendants that the galvanometer is made to perform an additional function in their apparatus, but this fact will not relieve them from the charge of infringement so long as all the elements of the complainants' patent are embraced in their system. *Williames* v. *Barnard*, 41 Fed. Rep. 364. A careful examination of the testimony, which displays a special knowledge of the art, united with unusual intelligence and ability, on the part of the witnesses, leaves no doubt that the defendants are infringers of the third and fourth claims of the reissued patent. An elaborate review of the testimony, with references to the numerous models and diagrams contained in the exhibits, would extend this opinion to an unreasonable length, and, under the circumstances of the case, is not necessary.

The validity of the reissue was vigorously attacked on the ground of its alleged variances from the original patent, and chiefly because the latter does not contain even a suggestion of a single circuit form of apparatus; but a comparison of the specifications and drawings of the two patents does not sustain this objection. Fig. 2 in the drawing of each patent shows a single wire; and if by mistake or accident, the original specification did not describe with sufficient plainness the use and application of this wire, it was permissible to the patentee, under the provisions of the act of congress relating to reissues, to supply the omission as soon as it was discovered; and this he did within a few months after the date of the original. The single circuit was clearly indicated in the original, and by a fair construction the patentee would have been entitled to its use. As already shown, the claims in suit were not enlarged in the reissue. In fact the fourth claim is restricted by the words "to operate substantially as set forth."

It is further insisted on by the defendants that the patent in suit does not contain a patentable combination, in that it is only an aggregation of old parts or elements which act successively, and not simultaneously. The simultaneous co-operation of the parts is not essential to a patentable combination, if the parts are so arranged that the successive action of

each contributes to produce some one practical result, which result, when attained, is the product of the simultaneous or successive action of all the elementary parts, viewed as one entire whole. The term "co-operation" does not mean acting together or simultaneously, but unitedly to a common end. *Birdsall* v. *McDonald*, 1 Ban. & A. 165; *Forbush* v. *Cook*, 2 Fish. Pat. Cas. 668; *Hoffman* v. *Young*, 2 Fed. Rep. 77. So here the electrical protection of the conductors is the result produced by the combination, and the two instruments guard the same line at the same time. One instrument protects it from cutting, and the other from short-circuiting. Remove either instrument, and the result fails *pro tanto*. This result was useful, and never before known. The design of the combination was to protect the patented apparatus against the methods of disabling it by tampering with the conductors, as could be done with the prior systems. The instruments co-operate in making good each other's deficiencies, and the arrangement of the conductors is such that all their essential parts are brought under the protection of the instruments. To this end the resistance co-operates with the closed circuit instrument by forming a path for the current, when the apparatus is in its normal condition, so that a continuous current may flow through the conductors and through the instrument without giving an alarm. It co-operates with the open circuit instrument by enfeebling the current to such an extent that the open circuit instrument is not called into action until a short circuit is formed, and the current thereby increased. In view of the authorities, this constitutes a patentable combination, leading to a new result by new means.

But the defendants have introduced certain prior English patents which, they say, embrace substantially the same elements as are found in the patent in suit, and thus deprive Guernsey of the claim of originality. It is not asserted that the inventions contained in the English patents are identical with that of the Guernsey patent, but that, in the state of the art at the date of the Guernsey original patent, it required only simple modifications and substitutions in the English devices to make them produce the same results as are secured by the Guernsey combination. The English patents referred to are those of Tyer, (1865,) Varley, (1865,) and Moxon, (1866.) The device of Tyer is an apparatus for transmitting signals indicating the position of trains upon a railway, and his patent contains no suggestion that it could be adapted to perform the office of a burglar alarm. It can be easily disabled by cutting one of its wires, and is thus incapable of effecting the result secured by the Guernsey invention, which is the electrical protection of all parts of the conductors between the signal instruments and the points to be protected. The Varley apparatus is a modification of the ordinary closed circuit system, and does not contain any instrument corresponding to the signal instrument of the open circuit system, or any other means of giving an alarm which is operated by an abnormal strengthening of the current, nor does it contain a resistance separate and distinct from the instruments; and it can be entirely disabled, if used for central office protection, by inserting a battery in some part of the line leading from the circuit closer to the alarm instrument.

The Moxon patent would also require substantial alterations to make it accomplish the results which are obtained by the Guernsey combination. The proposed modifications and substitutions would be in the nature of inventions, and are not such as would readily occur to any one skilled in the art. They do not consist merely in the substitution of one known equivalent for another, without any change in the resulting mode of operation; but it is proposed to substitute for one or the other of the elements of the prior combination something having a different or additional function, which amounts to the same thing as adding to the combination a new and distinct instrument, and makes it a new combination having functions that it did not before possess. Defenses of this character have been frequently discountenanced by the courts. *Wooster* v. *Blake*, 8 Fed. Rep. 429; *Dudgeon* v. *Watson*, 29 Fed. Rep. 248; *Asmus* v. *Alden*, 27 Fed. Rep. 684. Here, as in *Dudgeon* v. *Watson*, the defendants had used practically the same combination as is covered by the Guernsey patent, and subsequently made the changes by which they sought to escape infringement; but in that case the court held that the defendants accomplished the same result by similar or equivalent means.

Among other objections to the Guernsey reissue, it was urged that no interference was had between the reissue application and the Holmes & Roome patent, of December 20, 1870; but there is no proof that Holmes & Roome were the prior inventors. On the contrary, the invention claimed in the Guernsey reissue was shown and described in the Guernsey original patent, which antedates any date of Holmes & Roome. The English patent to Holmes & Roome, although dated as of November 1, 1870, was not in fact issued until April 2, 1871, the date at which the great seal was attached; and therefore the provisions of section 4887 of the United States Revised Statutes do not attach to the corresponding patent issued by the United States. The English patent to Holmes & Roome, not being sealed, was not in existence until after the date of the Guernsey patent. *Gold & Stock Tel. Co.* v. *Commercial Tel. Co.*, 23 Fed. Rep. 340. The able and ingenious argument of defendants' counsel created at first some doubts of the validity of the Guernsey reissue; but, after a careful consideration of the various objections presented by him, both orally and in his printed briefs, the conclusion has been reached that Guernsey was the original inventor of the combination claimed by him, and that the reissued letters patent are valid. A decree will be entered for the complainants, excepting as against the individuals named as defendants, in relation to whom there is no proof that they were personally guilty of infringement.